UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE ESTATE OF LARRY SHAW and SUSAN
SHAW, as the Executor of the Estate of Larry Shaw,
asserting claims on behalf of a New York
corporation, SHAW FAMILY ARCHIVES, LTD.
on a shareholder derivative basis and/or, when so
pleaded, individual claims for the benefit of the
ESTATE OF LARRY SHAW,

Plaintiffs,

    -against-

No. 7:14-cv-3849 (NSR)

EDIE SHAW MARCUS aka Edith Marcus, META
SHAW STEVENS aka Meta Stevens, DAVID
MARCUS, MELISSA STEVENS, GARY
ADELMAN, ESQ., and SAM SHAW INC.,

Defendants,

    -and-

SHAW FAMILY ARCHIVES, LTD.,

as a Nominal Party to
the Action.

---

SAM SHAW, INC., META STEVENS, EDITH
MARCUS, MELISSA STEVENS, and DAVID
MARCUS,

Plaintiffs,

    -against-

No. 7:14-cv-5653 (NSR)

THE ESTATE OF LARRY SHAW and SUSAN
SHAW,

Defendants.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/22/2015

**OPINION AND ORDER**

NELSON S. ROMÁN, United States District Judge

Before the Court are three motions:  (1) a motion to dismiss the Second Amended

Complaint filed by Sam Shaw, Inc., Meta Stevens, Edith Marcus, Melissa Stevens, and David

Marcus (the "Shaw Family Defendants")[1]; (2) a motion for sanctions pursuant to Rule 11 filed

by Shaw Family Defendants; and (3) a motion to dismiss the initial Complaint filed by Gary

Adelman, Esq., which the Court construes as a motion to dismiss the Second Amended

Complaint.[2]  For the following reasons:  Adelman's motion is GRANTED in its entirety; Shaw

Family Defendants' motion to dismiss is GRANTED in part and DENIED in part; and Shaw

Family Defendants' Rule 11 motion is DENIED in its entirety.

**FACTUAL ALLEGATIONS**[3]

A.      *The 1994 Action and the 1998 Trust*

Sam Shaw ("Sam")[4] was a photographer whose subjects included celebrities such as

Marilyn Monroe, Marlon Brando, and Aaron Copland.  Sam had three children, Larry Shaw

("Larry"), Edie Shaw Stevens ("Edie"), and Meta Shaw Marcus ("Meta").  Larry was also a

photographer.  He and his father, Sam, had a contentious relationship.  In 1994, Sam sued Larry

in New York Supreme Court to recover photographs that were in Larry's possession, which Sam

claimed to have snapped (the "1994 Action").  Larry asserted cross-claims concerning the scope

of Larry's right to commercially exploit certain photographs of Marilyn Monroe that Sam had

---

[1] Shaw Family Defendants initially filed a motion to dismiss the Amended Complaint, and after the Estate filed a Second Amended Complaint, Shaw Family Defendants served supplemental briefing (with leave of the Court) addressing the additional claims asserted in the new pleading.  To the extent it is necessary, the Court construes Shaw Family Defendants' motion as one to dismiss the Second Amended Complaint.

[2] Defendant Meister Selig & Feing, LLP initially joined in this motion, but it was dropped from the case upon the filing of the Amended Complaint.  (*See* ECF No. 19.)

[3] All nonconclusory factual allegations in the Second Amended Complaint are accepted as true for purposes of deciding the instant motions.  Additional facts have been drawn from other judicially noticeable sources.

[4] For clarity, the Court departs from its typical practice of using last names in this Opinion.

assigned to Larry.  However, over the course of the succeeding eight years, the litigation

expanded into a contest over the attribution and ownership of virtually all photographs snapped

by either Larry or Sam during their lifetimes.

In 1998, during the pendency of the 1994 Action, Sam allegedly executed a trust

purporting to convey all copyrights he owned to a trust for the benefit of Edie and Meta, and

completely disinheriting Larry (the "1998 Trust").  (The Estate alleges that this trust was invalid

because the copyrights it purported to transfer were disputed at the time of execution.)  Sam died

on April 5, 1999, and Edie and Meta continued to litigate the 1994 Action against their brother

Larry.

B.    *The 1994 Action Settles in 2002*

The 1994 Action ultimately settled on June 5, 2002, when the parties verbally set forth

the terms of their settlement in open court before a Judicial Hearing Officer (the "2002

Settlement").  (*See* Adams Decl. Ex. 1, ECF No. 90-1 [hereinafter 2002 Settlement].)  The

instant litigation largely concerns the terms of that settlement, which was transcribed but never

reduced to a separate, written agreement.

The 2002 Settlement states that, in consideration for settling the 1994 Action:

> An entity will be formed. . . . The name of that entity will be the Shaw Family
> Archives. . . . Larry Shaw, Meta Shaw Stevens and Edith Shaw Marcus shall be
> principals in that entity and their respective interests in that entity will be the following:
> Larry Shaw shall own 50 percent of that entity. . . . Meta Shaw Stevens shall own 25
> percent of that entity and Edith Shaw Marcus shall own 25 percent of that entity.  That
> entity shall own and take possession of, in a manner set forth below, all of the
> photographs involved in this litigation. . . .  That includes each and every photograph shot
> by either Sam Shaw or Larry Shaw during the course of their respective careers [or]
> lifetimes . . . together with those photographs taken by third parties which either of them
> claim as being owned by them via some gift or sale from a third party, all subject to
> claims by third parties.[5]

---

[5] Unless otherwise indicated, the Court will use the phrase "subject photographs" to refer to all photographs
snapped by either Larry or Sam during their lifetimes, and will use the phrase "subject copyrights" to refer to the
copyrights in the subject photographs.

(2002 Settlement at 3-5.)  The 2002 Settlement does not explicitly mention "copyright" or

"exclusive rights."  Instead, it simply uses the word "photographs" or the phrase "photographs,

images, transparencies, negatives."  The 2002 Settlement transcript makes no mention of royalty

payments for use of the photographs.  It does, however, include a penalty provision as follows:

> In the event any of the parties herein from this date forward, June 5, 2002, market,
> commercialize, attempt to sell, attempt to make any type of deal with respect to an image
> involved in this transaction . . . [i]ncluding gifts, . . . without the majority agreement of
> the other parties, then that person shall be penalized . . .

(2002 Settlement at 23.)  Toward the end of the transcript, the presiding Judicial Hearing Officer

personally addressed Larry, Edie, Meta, and David and asked each in turn whether they "heard

the terms of the stipulation," "discussed it with" counsel, and "agree with it," and each party said

"yes."  The chief issue in this litigation is whether the 2002 Settlement effected a transfer of

copyrights from Larry, Edie, and Meta to the new entity, Shaw Family Archives.

Shaw Family Archives, Ltd. was formed shortly after the settlement.  For the next several

years, during which time Larry effectively ran the company, Shaw Family Archives allegedly

marketed and licensed copies of the subject photographs, conspicuously identifying Shaw Family

Archives, Ltd. as the copyright owner on notices, treating licensing revenue as belonging to

Shaw Family Archives, and paying no royalties to Larry, Edie, or Meta.  Larry, Edie, and Meta

instead received profit distributions as shareholders of Shaw Family Archives.  Shaw Family

Archives, on the other hand, never took any action to register the subject copyrights in its name

with the Copyright Office.  Larry died on October 19, 2007, and his Estate, by his wife Susan

Shaw, brings the instant action against Defendants.

C.   *Edie and Meta's Alleged Scheme to Divert Copyrights*

The Estate alleges that Edie and Meta schemed to divest Shaw Family Archives of the

copyrights that it owned as a result of the 2002 Settlement.

4

The Estate alleges that David Marcus, Edie's son and an attorney, sought to further Edie and Meta's scheme by manufacturing a false judicial record on the issue of copyright ownership. In 2005, the Shaw family and the Marilyn Monroe family filed competing lawsuits concerning photographs of Marilyn Monroe snapped by Sam Shaw. *See* Complaint, *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, No. 05-cv-3939 (S.D.N.Y. filed Apr. 19, 2005). In the Complaint and two amended complaints in that action, the plaintiffs Shaw Family Archives, Edie, and Meta alleged that the copyrights in the photographs at issue passed from Sam Shaw to Edie and Meta pursuant to the 1998 Trust. *Id.* ¶¶ 11-12. They further alleged that Shaw Family Archives had only the right to market and commercially exploit the photographs as a result of the 2002 Settlement. *Id.* David Marcus signed the Complaint and the amendments thereto.

In 2008, Edie and Meta allegedly executed an assignment from themselves to Sam Shaw Inc. (an entity that they jointly controlled) of copyrights in Sam's photography (the "2008 Assignment"). They then began registering copyrights in the name of Sam Shaw Inc. with the Copyright Office, and at some point caused Shaw Family Archives to pay royalties to Sam Shaw Inc. The Estate alleges that the copyrights that Edie and Meta purported to assign actually belonged to Shaw Family Archives as a result of the 2002 Settlement; Shaw Family Archives had simply never formally registered those copyrights with the Copyright Office.

Finally, the Estate alleges that Defendants continued to attempt to build a judicial record as to copyright ownership in the Bankruptcy Court once Shaw Family Archives filed for Chapter 11.

### D.   *Edie and Meta's Alleged Scheme to Destroy the Estate's Equity*

The Estate also alleges that Edie and Meta sought to destroy or convert the Estate's equity in Shaw Family Archives by driving up Shaw Family Archives' legal bills. This theory is highly confusing and contradictory as described in the Second Amended Complaint. Essentially,

William Greenawalt and Jeffrey Tunick were two of the attorneys who represented the parties in the 1994 Action, but were never paid for their services. The Estate alleges that their fees were enforceable against the Shaw Family Archives collection, and that Shaw Family Archives had the funds to pay the attorneys. The Estate further alleges that Edie and Meta refused to use Shaw Family Archives' funds to pay Tunick even though Tunick had obtained judicial rulings entitling him to payment. At the same time, Edie and Meta expended enormous amounts of Shaw Family Archives' funds to contest Greenawalt's fees, even though the litigation was frivolous. The Estate alleges that this was part of a scheme to somehow destroy the Estate's equity in Shaw Family Archives, or somehow position Edie and Meta to convert the Estate's equity, and it ultimately drove Shaw Family Archives into bankruptcy.

   E.  *The Chapter 11 Action*

   On June 1, 2011, Shaw Family Archives filed a voluntary Chapter 11 petition in the Bankruptcy Court for the Southern District of New York. *In re Shaw Family Archives, Ltd.*, No. 11-23099-rdd, ECF No. 1 (S.D.N.Y. Bankr.) [hereinafter Chapter 11 Docket]. The chief creditors were Tunick and Greenawalt, whose fees from the 1994 Action had still not been paid.

   In the Chapter 11 proceeding, Shaw Family Archives did not assert ownership of copyrights in any of the subject photographs. In its petition schedules, Shaw Family Archives merely asserted that it owned "marketing and commercialization" rights pursuant to the 2002 Settlement. *See* Amended Schedule B, Chapter 11 Docket No. 65. Indeed, Melissa Stevens, acting as the debtor's operations manager, addressed Judge Drain directly to explain that, in her view, copyrights in Sam's photography passed by trust from Sam to Edie and Meta (her aunt and mother), and that the 2002 Settlement conveyed to the Shaw Family Archives only marketing and commercialization rights. *See* Transcript of December 5, 2013 Hearing at 19-25, Chapter 11 Docket No. 232. The Estate alleges that Shaw Family Archives made these representations and

6

did not assert copyright ownership because Shaw Family Defendants, whose interests were adverse to the Estate's, controlled Shaw Family Archives in the Chapter 11 proceeding.

The Estate filed four claims as a creditor in the Chapter 11 proceeding: Claim 8 described as "fraud re attorney lien" in the amount of $2 million, Claim 9 described as "shareholder derivative" in the amount of $2 million, Claim 10 described as "shareholder distributions" in the amount of $800 thousand, and Claim 18 described as "breach of fiduciary duty" in the amount of $1 million. *See* Claims Register, Chapter 11 Docket. From a review of the Declaration of Susan Shaw attached to the proofs of those claims, it appears those four claims share a common nucleus of operative fact with the Estate's claims in the instant litigation. *See id.* The Estate withdrew these claims prior to plan confirmation, but secured a reservation of rights in the final confirmed plan as follows:

> The estate of Larry Shaw, deceased and [*sic*] Susan Shaw have contended that they have claims and potential actions or causes of action against the Shaw Sisters and other shareholders, officers or directors of SFA, based on various grounds, including, *inter alia*, waste, mismanagement, negligence, breach of fiduciary duty and/or misfeasance in the management of SFA and its business. The estate of Larry Shaw, deceased [*sic*] and Susan Shaw shall retain and may assert any and all causes of action they may have based on the foregoing on and after the Effective Date of the Plan, including but not limited to a shareholder's derivative action, against the Shaw Sisters or other shareholders, officers or directors of SFA.

Fourth Amended Consolidated Chapter 11 Plan and Disclosure Statement at 63, Chapter 11 Docket No. 246.

The Estate also asserts aiding and abetting claims against Gary Adelman, an attorney retained by Edie and Meta. In short, the Estate claims that Adelman advised Edie and Meta to execute the 2008 Assignment and to litigate the Greenawalt fee action while declining to use Shaw Family Archives' funds to pay Tunick's fees.

Shaw Family Defendants move to dismiss all of the claims in the Second Amended Complaint (they do this by filing one motion directed to the Amended Complaint and

supplemental briefing directed to the additional claims asserted in the Second Amended Complaint). Defendant Adelman moves to dismiss all of the claims asserted against him in the initial Complaint, which the Court construes as a motion to dismiss all of the claims asserted against him in the Second Amended Complaint. Shaw Family Defendants also move for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.

## STANDARD ON A MOTION TO DISMISS

To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In applying this standard, a court should accept as true all well-pleaded factual allegations, but should not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.*

## DISCUSSION

As the Estate explains in its briefings, there are two categories of claims in the Second Amended Complaint. The first category comprises claims related to copyright ownership. The Second Amended Complaint claims that Shaw Family Archives owns the subject copyrights, or, in the alternative, is a beneficial owner. The Estate asks for declaratory and injunctive relief to protect Shaw Family Archives' purported ownership of the copyrights and to prevent Defendants

from acting adverse to Shaw Family Archives' ownership claim, as well as disgorgement of any royalties paid to Sam Shaw Inc.

The second category comprises claims related to Edie and Meta's alleged waste and mismanagement of Shaw Family Archives.  With respect to these causes of action, the Second Amended Complaint requests various forms of declaratory, injunctive, and compensatory relief.

## I.     Copyright Ownership Claims

### A.     *Claims Concerning the 2002 Settlement*

With respect to the Estate's claims related to copyright ownership, the Second Amended Complaint is very poorly drafted, highly unclear, and confusing.  The Estate parses legal arguments as separate claims for declaratory relief and unnecessarily duplicates claims.[6]  In substance, the Estate appears to seek three main forms of relief:  (1) a declaratory judgment that Shaw Family Archives is the owner of the subject copyrights, (2) injunctive relief compelling Edie, Meta, David, Melissa, and Sam Shaw Inc. to take all steps necessary to permit or cause the subject copyrights to be registered in the name of Shaw Family Archives and to take no further actions incompatible with Shaw Family Archives' ownership, and (3) disgorgement of copyright royalties paid to Sam Shaw Inc.  The Estate asserts two primary theories for its entitlement to this relief.  First, the Estate claims that the 2002 Settlement transferred copyrights (legally or equitably) to Shaw Family Archives (Claims 1, 13, 14, 17, 18, and 21).  Second, the Estate argues that Edie and Meta or Sam Shaw Inc. are estopped from challenging Shaw Family

---

[6] For example, Claim 1 asks for a declaratory judgment that Shaw Family Archives is the owner of the subject copyrights based on the theory that the 2002 Settlement effected a transfer of the copyrights to Shaw Family Archives.  Claim 13 asks for a declaratory judgment that the 2002 Settlement transferred the copyrights to Shaw Family Archives by operation of law.  Claim 14 asks for a declaratory judgment that the 2002 Settlement transferred the copyrights to Shaw Family Archives because it was a signed writing.  Claim 17 asks for a declaratory judgment that the 2002 Settlement conveyed beneficial ownership to Shaw Family Archives, if not full copyrights.  Claim 18 asks for a declaratory judgment that the 2002 Settlement transferred the subject copyrights to Shaw Family Archives because Edie and Meta disclaimed all right to make any decisions with respect to the subject photographs without a majority vote (which is really just a contract interpretation argument).

Archives' ownership claim based on representations made in contracts and to courts (Claim 12) or based on Sam Shaw Inc.'s withdrawal of claims in the Chapter 11 action concerning Shaw Family Archives (Claim 20).

### 1. Legal or Equitable Transfer

#### a) *It is plausible that the 2002 Settlement is an enforceable transfer.*

It is plausible that the 2002 Settlement transferred copyrights to Shaw Family Archives. Copyright Act § 204(a) sets forth the prerequisites for transferring a copyright:

> A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

17 U.S.C. § 204(a). The principal purpose of the writing requirement is not to effectuate the parties' intent, but rather "to protect authors from those claiming, contrary to the author's view of the facts, that he or she transferred rights in the work." *Tjeknavorian v. Mardirossian*, 56 F. Supp. 3d 561, 565 (S.D.N.Y. 2014) (quoting 2 Patry on Copyright § 5:106). "It imposes a rigid default in favor of letting creators retain their interests in copyrighted work." *Id.* Although § 204(a) is occasionally referred to as copyright's "statute of frauds," it is "more stringent than traditional statues of frauds" because it does not primarily serve an evidentiary function; rather, "it ensures that a copyright will not be inadvertently transferred[,] forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred[, and] provides a guide for resolving disputes." *Id.* at 565; 2 Patry on Copyright § 5:106.

No particular form of transfer is required. *See Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) ("It doesn't have to be the Magna Charta; a one-line pro forma statement will do."). But whatever the form, a transfer must be "clear." *Tjeknavorian*, 56 F. Supp. 3d at 567; *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1158-59 (S.D.N.Y.

1996); *Playboy Enters., Inc. v. Dumas,* 831 F. Supp. 295, 308 (S.D.N.Y. 1993), *aff'd in part and rev'd in part on other grounds,* 53 F.3d 549 (2d Cir. 1995)).  The writing need not explicitly mention "copyright" or "exclusive rights," but the better practice is that it should.  *Papa's-June*, 921 F. Supp. at 1159.

In *Playboy Enterprises*, a magazine publisher sought a declaratory judgment that it owned copyrights in paintings it purchased from a freelance artist.  53 F.3d at 553.  The publisher claimed that the artist had transferred copyrights because the phrase "payee acknowledges payment in full for the assignment to Playboy Enterprises, Inc. of all right, title and interest in and to the [listed] items" appeared in a legend on the back of each check used to pay for the subject paintings.  *Id.* at 560.  The district court held this language insufficient under § 204(a), reasoning that it referred only to "items"—i.e., the physical embodiment of a work, which did not unambiguously include copyrights.  *Playboy Enters.*, 831 F. Supp. at 308.  The Second Circuit disagreed that the only way to interpret the language was that it transferred only the physical embodiment.  However, the Second Circuit affirmed the district court's dismissal because the evidence concerning the purported underlying agreement to transfer copyrights was ambiguous.  *Playboy Enters.*, 53 F.3d at 564.

Other cases have held that language such as "all right, title and interest" may encompass copyrights.  *See Shugrue v. Cont'l Airlines, Inc.*, 977 F. Supp. 280, 285 (S.D.N.Y. 1997) (finding the phrase "all right, title and interest" to encompass software copyrights and citing analogous cases); *see also Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) (finding that a transfer of all assets, "tangible and intangible alike," included copyrights); *cf. Mason v. Jamie Music Pub. Co.*, 658 F. Supp. 2d 571, 581 (S.D.N.Y. 2009) (construing the transfer not to confer copyrights not specifically listed).  The court in *Shugrue* noted that this is

11

especially true in the context of software, which is "not like paintings and other tangible objects," because nonconsumer purchasers would not be interested in the physical embodiment of a computer program. *Shugrue*, 977 F. Supp. at 285

Here, the 2002 Settlement does not explicitly mention "copyright" or "exclusive rights." Nor does it use the phrase "all right, title, and interest," or any analogous phrase. Instead, it simply uses the word "photographs" or the phrase "photographs, images, transparencies, negatives," and includes a penalty provision as follows:

> In the event any of the parties herein from this date forward, June 5, 2002, market, commercialize, attempt to sell, attempt to make any type of deal with respect to an image involved in this transaction . . . [i]ncluding gifts, . . . without the majority agreement of the other parties, then that person shall be penalized . . . .

(2002 Settlement at 23.) The words "photographs, images, transparencies, negatives" refer to the physical embodiments of a photograph. But the penalty provision implies that the parties also intended to convey to Shaw Family Archives (and to take away from Larry, Edie, and Meta individually) the exclusive right to "make any type of deal" with respect to the "photographs, images, transparencies, [and] negatives." True, physical embodiments of photographs may be sold, marketed, commercialized, and dealt with, and the right to do so is not one of the exclusive rights granted to owners of copyrights.[7] But even if certain vintage prints are highly valuable, the right to sell transparencies and negatives (i.e., undeveloped film), without the right to market prints made from them, is not particularly valuable to a nonconsumer like Shaw Family Archives. Such an interpretation is nonsensical in the context of the 2002 Settlement and the resulting business model of Shaw Family Archives. For example, as Melissa Stevens testified in the Chapter 11 proceeding in describing how Shaw Family Archives does business, "The ABG

---

[7] Owners of copyrights in photographs have the following exclusive rights: (1) to "reproduce the copyrighted work in copies or phonorecords;" (2) to "prepare derivative works based upon the copyrighted work;" (3) to "distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;" and (4) to "display the copyrighted work publicly." 17 U.S.C. § 106.

transaction requires us to deliver . . . all of our Marilyn Monroe photographs by Sam Shaw.  So in doing so, you know, again, obviously we're not going to hand them a thirty-five-millimeter negative from 1956.  We'll make the delivery in the form of digital files [i.e., copies]."  Transcript of March 15, 2012 Hearing at 11:25-12:4, Chapter 11 Docket No. 107.  Furthermore, by agreeing to a penalty provision whereby Larry, Edie, and Meta would be penalized for making side deals, it is plausible that the parties contemplated that Larry, Edie, and Meta were transferring away whatever individual rights, including copyrights, they each had with respect to the subject photographs.  The parties made no provision for Shaw Family Archives to pay royalties for its use of the subject photographs to Larry, Edie, Meta, or any other purported copyright owner.

In sum, it is plausible to interpret the 2002 Settlement as transferring more than just the right to market the physical embodiments of the subject photographs, but as also conveying the exclusive, perpetual, irrevocable right to market copies of the subject photographs, images, transparencies, and negatives (without the payment of any royalties to any other person), which subsumes one or more (or all) of the exclusive rights granted to copyright owners.[8]  Defendant's argument that the 2002 Settlement "obviously" conveys only a license to market the subject photographs is unpersuasive, because the penalty provision expressly excludes Larry, Edie, and Meta from "mak[ing] any type of deal" concerning the subject photographs on their own and makes no provision for royalty payments to Larry, Edie, or Meta (which the parties certainly would not have left wholly unaddressed had they intended to convey a license).

_____

[8] If Defendants meant to distinguish copyright ownership from ownership of the exclusive, perpetual, irrevocable right to "make any type of deal" with respect to copies of the subject photographs free and clear of any obligation to pay royalties, Defendants have not done so persuasively at this stage.  If Defendants seek to rely on such a distinction in the future, they will need to explain exactly what that difference is, both on the law and in terms of practical implications.

This interpretation accords with the context of the 2002 Settlement. Despite its narrower origins, by the time of the 2002 Settlement, the litigation had evolved into a contest over the ownership of virtually all photographs snapped by either Larry or Sam during their lifetimes, and all rights of commercial exploitation of those photographs.[9] If Shaw Family Archives was created to effect a global settlement of claims to the subject photographs, it is hard to imagine what purpose would be served by Shaw Family Defendants' purported interpretation of the 2002 Settlement. Transferring to Shaw Family Archives physical custody of the subject photographs, vintage prints, and physical film, along with a license to market those photographs, but not copyrights, would leave unresolved the principal economic dispute in that litigation: who among Larry, Edie, and Meta would be entitled to the money derived from exploiting the photographs.

This interpretation also accords with much of the alleged post-settlement course of conduct. For years following the 2002 Settlement, Shaw Family Archives openly marketed and licensed copies of the subject photographs, conspicuously identifying Shaw Family Archives, Ltd. as the copyright owner on notices and treating all licensing revenue as revenue to Shaw Family Archives, without paying royalties to Larry, Edie, or Meta (who instead received profit distributions as shareholders of Shaw Family Archives (*see* Second Am. Compl. ¶ 190)). *See Mahan v. Roc Nation, LLC*, No. 14 CIV. 5075 LGS, 2015 WL 1782095, at *4 (S.D.N.Y. Apr. 15, 2015) ("[The] absence of any royalties sent to Plaintiff also gave him reason to know of his

---

[9] Defendants' assertions to the contrary are not persuasive. The Appellate Division did not "find" that the 1994 Action involved ownership of "tangible" photographs. *See Shaw v. Bressler*, 688 N.Y.S.2d 525 (App. Div. 1999) The word "tangible" does not appear in that court's decision at all, and the difference between tangible and intangible rights was not an issue on that appeal. And in nearly the same breath, Defendants contend that the 1994 Action concerned "marketing" rights. The other cases cited by Defendants do not persuade the Court that this issue is collaterally estopped. From a review of those decisions, it appears that no judge has ever "found" that the 1994 Action concerned only tangible rights.

injury.").  Moreover, Edie's testimony in Greenawalt's charging lien fixing proceeding[10] favors the Estate:

> She testified [that] before Greenawalt c[a]me on to the case she and her sister, [Meta] Stevens, had a 100% interest in Sam Shaw photographs, but upon settlement she and her sister ended up with 25% each and her brother a 50% interest.
>
> [Edie] testified that upon her father's death, she and her sister [Meta] Stevens became the sole owners to the Sam Shaw photographs and that Larry Shaw had no legal interest in any of the Sam Shaw photographs.  Thus, by the time Greenawalt came on to the case, defendant Larry Shaw had no interest in the subject photographs.

(Crespo Report at 27.)  Viewing this testimony in the light most favorable to the Estate, it demonstrates Edie's belief that the 2002 Settlement stripped her of all rights (including copyrights) that she had in Sam's photographs in exchange for a 25% stake in Shaw Family Archives.  Similarly, David Marcus in the Tunick fee litigation submitted an affirmation on behalf of Edie, Meta, and Shaw Family Archives that stated, "The settlement herein pertained to the ownership of the photographic images *and copyrights*, it did not contemplate the splitting of any insurance settlement."  (Adams Decl. Ex. J, ECF No. 90-10, at A779-A780.)[11]

To be clear, the Court is not holding that the 2002 Settlement effected a transfer of any of copyrights to Shaw Family Archives.  The Court is simply holding that the language of the 2002 Settlement transcript, viewed in light of the factual allegations in the Second Amended Complaint, raise a plausible inference sufficient to survive a motion to dismiss.  This conclusion may change at summary judgment depending on the evidence adduced.  *Mason v. Jamie Music Pub. Co.*, 658 F. Supp. 2d 571, 581 (S.D.N.Y. 2009) ("Any ambiguities or doubts concerning the scope of rights assigned by the [authors] . . . must be construed in favor of the [authors]."

---

[10] The charging lien was referred to Special Referee Louis Crespo for "fixing" (i.e., determining reasonable attorneys' fees).  Referee Crespo held hearings from July 2009 through May 2010 and issued a Report and Recommendation (the "Crespo Report").  (*See* Adams Decl. Ex. 2-3, ECF No. 90-2, 90-3 [hereinafter "Crespo Report"].)

[11] Defendants allege (without certification from the Copyright Office) that SFA never took steps to register the copyrights in its own name with the Copyright Office.  This fact, though relevant, it is insufficient at the Rule 12(b)(6) stage to find that the parties did not transfer copyrights.

(quoting *Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc.*, 16 F. Supp. 2d 259, 285 (S.D.N.Y. 1997)); *Jim Henson*, 16 F. Supp. 2d at 285 ("Thus, under both the 1909 and 1976 Copyright Acts, unless the author has given up his or her rights under copyright in a clear and unequivocal manner, he or she retains these rights."); *Papa's-June Music, Inc. v. McLean,* 921 F. Supp. 1154, 1160 (S.D.N.Y. 1996) ("[T]ransfer agreements should be construed in favor of copyright transferor because section 204(a) reflects the policy judgment that copyright owners should retain all rights unless specifically transferred."); *Cohen v. United States*, 98 Fed. Cl. 156, 164 (2011) ("Courts have held that a license of rights in a given medium includes only such uses as fall within the unambiguous core meaning of the term and excludes any uses that lie within the ambiguous penumbra. Thus, any rights not expressly (in this case meaning unambiguously) granted are reserved."); 2 Patry on Copyright § 5:108 (explaining that "transfer of copyright ownership," as used in § 204(a) "is a defined term and cannot be ignored with a wink and a nudge that we all know what was meant").

The Court rejects Shaw Family Defendants' argument that the 2002 Settlement is insufficient because the transferee, Shaw Family Archives, did not exist on the date of the settlement.  The language "That entity [Shaw Family Archives] shall own and take possession of [the subject photographs]" can plausibly be interpreted as being self-executing upon the formation of Shaw Family Archives.  The language does not suggest any obvious condition precedent to the parties' obligation to assign the photographs to Shaw Family Archives.[12] *Killette v. Pittman*, 127 F.3d 1099 (4th Cir. 1997) (rejecting the district court's finding that a settlement agreement did not provide a "present transfer" of copyright where the "language used by the parties in the settlement agreement [did] not expressly condition the transfer of the

---

[12] And even if one were to view the formation of Shaw Family Archives as a condition precedent, the condition was satisfied when the entity was formed two weeks later.

copyright upon . . . payment"); *SCO Grp., Inc. v. Novell, Inc.*, No. 2:04CV139DAK, 2004 WL
4737297, at *5 (D. Utah June 9, 2004) (denying a motion to dismiss because, even though the
transfer document contained "no transfer language in the form of 'seller hereby conveys to
buyer'" but instead stated "seller 'will' sell, convey, assign, and buyer," it was ambiguous
"whether the parties contemplated a separate writing to actually transfer the copyrights after the
'required' copyrights were identified"); *cf. Manney v. Nole*, No. 12-CV-0050 SJF WDW, 2012
WL 2131185, at *2 (E.D.N.Y. June 11, 2012) ("This e-mail, even read in context with plaintiffs'
complaint, does not demonstrate that plaintiffs are entitled to a declaratory judgment regarding
ownership in the music catalogue.  As an initial matter, any potential transfer of ownership rights
was plainly subject to a condition precedent (*i.e.,* the recovery of 'current out of pocket
expenses'), and there is no indication that this condition was ever satisfied."); *Monarch
Licensing, Ltd. v. Ritam Int'l Ltd., Inc.*, No. 92 CIV. 3108 (PNL), 1992 WL 150641, at *4
(S.D.N.Y. June 15, 1992) (finding that a transfer had not occurred where an agreement provided
that "[u]pon termination," the assignor "agrees to assign all rights, title and interest in the
trademark and/or copyrights to" the assignee, but "[n]othing in the Agreement suggest[ed] that
the assignment of trademark and copyrights provision [was] self-executing").

 The Court also rejects Shaw Family Defendants' judicial estoppel argument.  Shaw
Family Defendants argue that Shaw Family Archives represented in a Complaint (and
amendments thereto) that Edie and Meta owned the copyrights to Sam Shaw's collection, and
that this representation should estop Larry and his Estate from asserting otherwise because the
court in that action relied on that representation.  This argument is unavailing at this stage
because the question of whether these representations are fairly attributable to Larry is a factual
issue.  Edie's son David Marcus is the attorney who signed the relevant Complaint (and the

amendments thereto) on behalf of Shaw Family Archives.  It seems inequitable to hold Larry's Estate to a representation where (1) the representation was apparently drafted by his adversary's son, (2) Larry did not "control" Shaw Family Archives on his own because Defendants were allegedly acting in concert against his interests, and (3) there is no evidence or factual allegation that suggests that Larry personally ratified the representation.  Therefore, judicial estoppel fails at the Rule 12(b)(6) stage.

b)      *The allocution satisfies the signature requirement.*

The Court also rejects Shaw Family Defendants' argument that the transcript cannot satisfy § 204(a) because it was not signed.[13]  Signature requirements are typically imposed to ensure that parties to an agreement have the present intention to adopt or accept a writing.  *See* N.Y. U.C.C. § 1-201(37); *see also PH Int'l Trading Corp. v. Nordstrom, Inc.*, 555 F. App'x 9, 11 (2d Cir. 2013) ("The purpose of the signature requirement [in the N.Y. U.C.C.] is to confirm that the party had 'present intention to authenticate the writing.'" (quoting a prior version N.Y. U.C.C. § 1-201 cmt. 39)).  Here, the court's allocution at the end of the 2002 Settlement transcript serves that very purpose.  The Judicial Hearing Officer personally addressed Larry, Edie, Meta, and David at the end of the proceedings and asked each in turn whether they "heard the terms of the stipulation," "discussed it with" counsel, and "agree with it," and each party said "yes."  There is no genuine question concerning the parties' intent to be bound by the terms expressed on the record—it was the single most unambiguous manifestation of intent in the entire transcript.[14]  The Court will not dismiss on this basis.

---

[13] Defendants do not dispute that a transcript constitutes a writing under § 204(a).  The Court thus does not address that question.

[14] Edie and Meta's unqualified assent to these terms renders irrelevant, at this stage, the issue of whether they appeared in the action individually or as administrators of Sam Shaw's estate.  It is plausible to infer from their unqualified assent that Edie and Meta agreed to transfer copyrights to the extent they personally owned any in Sam Shaw's photography.

c)      *Shaw Family Defendants' statute of limitations argument is unavailing.*

The Court also rejects Shaw Family Defendants' statute of limitations argument.  Shaw Family Defendants' entire argument relies on the faulty presumption that the three-year statute of limitations under § 507(b) of the Copyright Act applies to the Estate's claims.  Section 507(b) provides:  "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."  17 U.S.C. § 507(b).  But the Estate's claims are not brought under the provisions of the Copyright Act.  They are contract, trust, and equity claims, to which a six-year statute of limitations applies under New York law.  The Estate does not claim, for example, infringement or authorship.  Shaw Family Defendants' statute of limitations argument is therefore legally deficient and the Court will not dismiss on that basis.

\*      \*      \*

Because the Court has found plausible the Estate's claim that the 2002 Settlement transferred copyrights to Shaw Family Archives, it need not address the Estate's beneficial ownership, express trust, or constructive trust theories.  Shaw Family Defendants' motion to dismiss is denied as to claims 1, 4, 5, 13, 14, 17, 18, and 21.

2.      Estoppel

a)      *The Estate's equitable estoppel claims must be dismissed.*

The Estate's transfer by estoppel claims must be dismissed.  Claim 12 in the Second Amended Complaint alleges that Defendants are estopped from denying that Shaw Family Archives owns the subject copyrights because of unidentified "representations and warranties" in a licensing agreement with an entity called "ABG," which Judge Drain relied upon in the Chapter 11 proceeding.  Claim 12 must be dismissed because it fails to allege sufficient detail to place Defendants on notice of the basis of this claim.  The Second Amended Complaint does not

19

excerpt or summarize the purported representations.  It does not provide the factual context of

the agreement.  It does not explain how the purported representations were relied upon in the

Chapter 11 proceeding.  It is patently insufficient.

Presumably, the Estate is referring the following transaction:  At one point in the Chapter

11 proceedings, the debtor sought leave to enter into an agreement with an entity called

MM-ABG to license photographs of Marilyn Monroe snapped by Sam.  On March 14, 2012,

Judge Drain issued an order granting the debtor permission to enter into the licensing agreement.

Chapter 11 Docket No. 102.  The "Exclusive Copyright License Agreement" provided:

> As of the date of this Agreement, all of the Assets are owned by Sam Shaw Inc. and/or
> [Shaw Family Archives.]  [Shaw Family Archives] has the sole and exclusive right to
> license the Assets throughout the Territory for the full term of the copyright and any
> extension or renewal thereof whether now in existence or hereafter created, and [Shaw
> Family Archives] has the sole and exclusive right to grant, transfer, deliver and set over
> under MM-ABG all of the rights granted by [Shaw Family Archives] to MM-ABG
> hereunder.

Exclusive Copyright License Agreement § 3.01(a), Chapter 11 Docket No. 67-1.  By its express

terms, the agreement is consistent with Shaw Family Defendants' position in the instant

litigation, so it cannot estop them.  Therefore, even if the Estate had provided sufficient detail in

its pleadings, Claim 12 would still lack merit.

>    b)    *The ownership issue is not subject to collateral estoppel.*

Claim 20 must be dismissed.  Claim 20 asserts that the Chapter 11 proceeding collaterally

estops Defendants from asserting that Sam Shaw Inc. owns any copyrights.  The Court applies

the preclusion law of New York.  *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006).  "Under

New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue

necessarily was decided in the prior action and is decisive of the present action, and (2) the party

to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in

the prior action."  *Id.*  "[C]ollateral estoppel effect will only be given to matters actually litigated

and determined in a prior action," because "[i]f an issue has not been litigated, there is no

identity of issues." *Id.* at 282 (quoting *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 456 (1985)).

Collateral estoppel does not apply here because the issue of copyright ownership was not

actually litigated or decided in the Chapter 11 action.  In a December 5, 2013 hearing concerning

plan confirmation, the debtor's and creditors' counsel explained to Judge Drain that in

negotiating a proposed Chapter 11 plan, they could not agree on what assets were encumbered by

Tunick and Greenawalt's liens.  Tunick and Greenawalt's position was that their liens

encumbered the entire Shaw Family Archives collection and all related rights, including

copyrights.  Shaw Family Archives' position was that the liens encumbered only the marketing

and commercialization rights that Shaw Family Archives obtained pursuant to the 2002

Settlement.  Melissa Stevens, Shaw Family Archives' operations manager (and Meta's daughter),

addressed the court directly.  Transcript of December 5, 2013 Hearing at 19-25, Chapter 11

Docket No. 232.  Ms. Stevens, despite her duties as an officer of Shaw Family Archives, argued

that Shaw Family Archives never owned copyrights because the 2002 Settlement conveyed only

marketing and commercialization rights.  She claimed that the copyrights at issue passed from

Sam Shaw by trust or will to Edie and Meta, who then transferred the copyrights to Sam Shaw

Inc. in 2008.  *Id.*  The court noted that if anyone should be raising this point, it should not be the

debtor (Shaw Family Archives), but the creditor Sam Shaw Inc., which had not raised this

objection.  *Id.* at 20-21.  "The debtor . . . should . . . want[] to have the copyrights as extensively

as possible in the debtor."  *Id.* at 21.  Recognizing the brazen conflict of interest that Ms. Stevens

had just demonstrated, the court suggested to Tunick and Greenawalt's counsel, "I think you

should move for a trustee . . . .  And I also think you should amend the plan, because that would

be a faster way to get rid of management."  *Id.* at 24.  As Judge Drain fittingly remarked:  "I'm

appalled." *Id.* at 25.  Thereafter, Shaw Family Archives, Edie, Meta, and Sam Shaw Inc. entered

into a stipulation stating that Tunick and Greenawalt's liens encumbered the Shaw Family

Archives collection and all related rights, including copyrights, "wherever located and in

whosoever [*sic*] hands they may be."  Stipulation, Chapter 11 Docket No. 237.

Although this Court joins in Judge Drain's sentiment, the issue of copyright ownership

was never litigated or decided in the Chapter 11 action.  Shaw Family Archives did not claim

copyright ownership.  Shaw Family Archives merely asserted that it owned marketing and

commercialization rights pursuant to the 2002 Settlement.  *See* Amended Schedule B at 3,

Chapter 11 Docket No. 65.  Therefore, no third party had the need or opportunity to contest

ownership.  The December 5 hearing did not force the issue because the subsequent stipulation

mooted any potential dispute over the copyrights as between Shaw Family Archives and Sam

Shaw Inc.  Therefore, the order confirming the Chapter 11 plan did not decide the issue of

copyright ownership in Shaw Family Archives' favor.

The Estate also argues that Sam Shaw Inc.'s withdrawal of claims in the Chapter 11

action operates as res judicata or collateral estoppel as to the copyright ownership issue.  Sam

Shaw Inc. was listed as a creditor in the amount of $21,000 on Shaw Family Archives'

schedules, but never filed a proof of claim.  Fourth Amended Consolidated Chapter 11 Plan and

Disclosure Statement at 36, Chapter 11 Docket No. 246.  Sam Shaw Inc. withdrew any claims

that it had against Shaw Family Archives prior to plan confirmation.  *Id.*; Chapter 11 Docket No.

238.  But the Estate is incorrect in its assertion that this withdrawal constitutes a concession on

the issue of copyright ownership.  Shaw Family Archives did not claim copyright ownership, so

Sam Shaw Inc. had no opportunity to litigate the issue (if it had attempted to file a claim, motion,

or adversary proceeding claiming copyright ownership, it would have been moot).  At best, Sam

Shaw Inc.'s withdrawal constitutes a waiver of royalties.  Claim 20 must be dismissed.

       B.      *Claims Concerning the 2008 Assignment*

The Estate also seeks a judgment invalidating the 2008 Assignment because Edie and

Meta allegedly had no bona fide claim to the copyrights they attempted to convey.  The Estate

advances two theories:  (1) that Edie and Meta had no copyrights because Shaw Family Archives

owned the copyrights and (2) that Edie and Meta had no copyrights because the 1998 Trust,

which purported to convey copyrights from Sam to Edie and Meta, was invalid as a fraudulent

conveyance (Claims 8 and 19).

The Estate's fraudulent conveyance theory with respect to the 1998 Trust is barred by the

statute of limitations.  A fraudulent conveyance claim must be commenced either within six

years from the date of the fraud or within two years after the plaintiff discovered the fraud or

could, with reasonable diligence, have discovered the fraud.  N.Y. C.P.L.R. 213(8).  The date of

the alleged fraud is the trust's execution date (in 1998), because the 1998 Trust was allegedly

fraudulent from its inception.  This action was filed well beyond six years after that date.

Therefore, the claim is timely only if it was filed within two years after the Estate could, with

reasonable diligence, have discovered the fraud.  In 2008, Edie and Meta registered the 1998

Trust with the Copyright Office.  (*See* Marcus Decl. Ex. 5, ECF No. 74-17.)  A registration with

the Copyright Office gives "all persons constructive notice of the facts stated in the recorded

document."  *See Mahan v. Roc Nation, LLC*, No. 14 CIV. 5075 LGS, 2015 WL 1782095, at *3

(S.D.N.Y. Apr. 15, 2015).  Therefore, the Estate was on constructive notice of the existence of

the 1998 Trust, and therefore the fraud, in 2008 as a matter of law.  This action was filed more

than two years later.  Claim 19 must be dismissed and claim 8 must be dismissed to the extent

that it relies on the purported invalidity of the 1998 Trust.

However, because the Court has found, *supra*, that it is plausible that the 2002 Settlement transferred copyrights to Shaw Family Archives, it is plausible as a corollary that the 2008 assignment was invalid.  Therefore, Claim 8 survives to the extent that it relies on the effect of the 2002 Settlement.

## II.    Corporate Governance Claims

### A.    *Board Composition and Management Salary Claims*

Claims 2, 3, 6 and 7 are board composition and management salary claims.  Claim 2 asks for an order installing an independent board member, on a theory of specific performance of the 2002 Settlement.  Claim 3 asks for an order declaring that the board is not validly constituted per the 2002 Settlement and invalidating its actions nunc pro tunc.  Claim 6 asks for disgorgement of salaries paid to Edie and Meta on the theory that Edie and Meta fraudulently paid themselves salaries to make up for profit distributions that they would have received had they not conveyed a portion of their shares to their children.  Claim 7 asks for injunctive relief equitably restructuring the board to comport with the 2002 Settlement.

Shaw Family Defendants argue that these claims are barred by res judicata because of orders issued by the Bankruptcy Court in the Chapter 11 proceeding.  However, the confirmed Chapter 11 plan provides:

> The estate of Larry Shaw, deceased and [*sic*] Susan Shaw have contended that they have claims and potential actions or causes of action against the Shaw Sisters and other shareholders, officers or directors of SFA, based on various grounds, including, *inter alia*, waste, mismanagement, negligence, breach of fiduciary duty and/or misfeasance in the management of SFA and its business.  The estate of Larry Shaw, deceased [*sic*] and Susan Shaw shall retain and may assert any and all causes of action they may have based on the foregoing on and after the Effective Date of the Plan, including but not limited to a shareholder's derivative action, against the Shaw Sisters or other shareholders, officers or directors of SFA.

(Chapter 11 Plan, at 63.)  Confirmation of a Chapter 11 plan is a final judgment on the merits with preclusive effect.  *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869 (2d Cir.

24

1991).  A reservation of rights included in a Chapter 11 plan that is specific and unequivocal preserves claims that would otherwise be barred by res judicata.  *See In re Futter Lumber Corp.*, 473 B.R. 20, 31 (E.D.N.Y. 2012) (explaining the various approaches followed by different courts to have addressed this question).  The Court finds that the reservation of rights meets the requisite level of specificity to cover claims 2, 3, 6, and 7.[15]  Shaw Family Defendants do not address the reservation of rights except to assert, without citation to any case law, that the Estate's reservation of rights gave the Estate the right to bring derivative claims, but not claims that might conflict with an order of the bankruptcy court.  Shaw Family Defendants provide no basis in law or in the language of the plan for such an interpretation.  Although this Court strongly disfavors duplicative litigation, Defendants could easily have prevented this.  If Defendants expected that the confirmation of the Chapter 11 plan would bar the Estate from bringing these claims, they should have objected to the Estate's reservation of rights.  Defendants did not object at the time and they cannot do so now.

       B.     *Waste/Mismanagement and Fiduciary Duty Claims*

Claims 9 and 15 seek damages for waste and breach of fiduciary duty resulting from Edie and Meta's decision to decline to pay Tunick's fees and to expend Shaw Family Archives' funds contesting Greenawalt's fees.  "The essence of a claim of . . . waste is the diversion of corporate assets for improper or unnecessary purposes."  *Aronoff v. Albanese*, 446 N.Y.S.2d 368, 370 (App. Div. 1982).  To prove corporate waste under New York law, a claimant must "demonstrate that no person of ordinary sound business judgment would say that the corporation received fair benefit."  *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 279 n.9 (2d Cir. 1986).  "[U]nder the New York business judgment rule, the actions of corporate directors are subject to judicial review only upon a showing of fraud or bad faith."  *Stern v. Gen. Elec. Co.*, 924 F.2d

---

[15] The effect of this reservation on claims asserted against Adelman is treated separately, *infra*.

472, 476 (2d Cir. 1991). "[A]llegations of 'waste,' standing alone, will not be enough." *Id.* The business judgment rule does not apply when directors or officers have an interest in a decision. *In re Croton River Club, Inc.*, 52 F.3d 41, 44 (2d Cir. 1995). "Directors are self-interested in a challenged transaction where they will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally." *Marx v. Akers,* 88 N.Y.2d 189, 202 (1996).

Here, the business judgment rule requires dismissal of the Estate's claims. The Estate alleges that Edie and Meta caused Shaw Family Archives to decline to pay Tunick's fees and to spend Shaw Family Archives' funds frivolously contesting Greenawalt's fees. This may have been ill-advised, but that is not enough to state a claim absent allegations of fraud or bad faith. The Estate attempts to meet this standard by summarily alleging that Edie and Meta sought to destroy or convert the Estate's equity in Shaw Family Archives. But the logical link between the fees litigation and the destruction of the Estate's equity is simply not apparent. It is unclear how running up attorneys' fees could have harmed the Estate's equity without also harming Edie and Meta's equity *pro rata*. The Second Amended Complaint does not make clear how these actions were meant to inure to Edie and Meta's benefit in a way that was "different from the benefit to shareholders generally." Claims 9 and 15 are dismissed.

## III.    Aiding and Abetting

The Estate asserts aiding and abetting claims against David Marcus, Melissa Stevens, and Gary Adelman. "Viable claims for the recovery of damages for the aiding and abetting of any tort rest upon allegations of fact constituting the elements of the existence of the underlying tort, knowledge thereof by the aider and abettor, and substantial assistance by the aider and abettor in the achievement of the tortious act." *Hudson v. Delta Kew Holding Corp.*, 43 Misc. 3d 1223(A) (N.Y. Sup. Ct. 2014).

A.    *David Marcus*

The Estate has alleged substantial assistance by David Marcus.  Specifically, the Estate claims that David Marcus drafted the Complaint, and amendments thereto, in the CMG/MMLLC action, which falsely alleged that Edie and Meta owned the subject copyrights.  (Second Am. Compl. ¶¶ 198-205.)  The Estate alleges that David Marcus knowingly did this to manufacture a judicial record furthering Edie and Meta's scheme to divert copyrights from Shaw Family Archives to Edie and Meta.  (*Id.*)  Shaw Family Defendants relied upon that Complaint in the instant motion as the basis for their argument that judicial estoppel should bar the Estate from claiming that Shaw Family Archives owns the subject copyrights.  *See supra* Part I.A.1.a.  This is enough, at the Rule 12(b)(6) stage, to permit claims to proceed against David Marcus.

B.    *Melissa Stevens*

The Estate has also alleged substantial assistance by Melissa Stevens.  Specifically, the Second Amended Complaint alleges that Melissa Stevens appeared before the Bankruptcy Court in the Chapter 11 action and advocated for the proposition that Shaw Family Archives did not own the copyrights at issue, knowing this to be untrue.  (Second Am. Compl. ¶¶ 249-64.)  Stevens allegedly sought to further Edie and Meta's scheme to divest Shaw Family Archives of copyright ownership.  This is enough, at the Rule 12(b)(6) stage, to permit claims to proceed against Melissa Stevens.

C.    *Gary Adelman*

All of the claims asserted against Defendant Gary Adelman must be dismissed based on claim preclusion.  To determine whether claim preclusion bars a subsequent action, the Court must consider whether: "1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same."  *Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 87-88 (2d Cir.

27

1997).  In the Second Circuit, the Court must also consider "whether an independent judgment in a separate proceeding would 'impair, destroy, challenge, or invalidate, the enforceability or effectiveness' of the reorganization plan."  *Id.* at 88 (quoting *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 875-76 (2d Cir. 1991)).  "This last inquiry may also be viewed as an aspect of the test for identity of the causes of action."  *Id.*

An order confirming a Chapter 11 plan is a final judgment on the merits with preclusive effect.  *In re Layo*, 460 F.3d 289, 294 (2d Cir. 2006).  The Estate and Adelman were both participants (whether or not they were named parties) in the Chapter 11 action.  *Farahzad v. Lawyers Title Ins. Co.*, No. 10-CV-6010 JS AKT, 2012 WL 4344325, at *3 (E.D.N.Y. Sept. 21, 2012).  Also, the Estate does not contest the Bankruptcy Court's jurisdiction.

The causes of action here are the same.  "Claims are identical for the purposes of the Court's *res judicata* analysis if they 'could have or should have [been] raised before confirmation of a bankruptcy plan.'"  *Farahzad*, 2012 WL 4344325, at *4.  The core factual allegations occurred before the filing of the Chapter 11 petition.  The subject copyrights were, by the Estate's own admission, Shaw Family Archives' most valuable asset.  It is likely that the reorganization plan would have differed depending on (1) whether Shaw Family Archives owned the subject copyrights, (2) whether or not Shaw Family Archives had any obligation to pay royalties for its use or licensing of copies of the photographs, and (3) whether the debtor's present management had a conflict of interest with creditors and shareholders.  Finally, and perhaps most importantly, the Estate did, in fact, bring these claims in the Chapter 11 action.  The Estate filed four claims:  Claim 8 for "fraud re attorney lien" in the amount of $2 million, Claim 9 for "shareholder derivative" in the amount of $2 million, Claim 10 for "shareholder distributions" in the amount of $800 thousand, and Claim 18 for "breach of fiduciary duty" in the

amount of $1 million.  *See* Claims Register, Chapter 11 Docket.  According to the Declaration of

Susan Shaw attached to the proofs of those claims, the Estate's claims in the Chapter 11 action

share a common nucleus of operative fact with the Estate's instant claims.  *See id.*

The only question that remains is whether the Estate's reservation of rights in the

confirmed Chapter 11 plan preserves the claims against Adelman.  Any "such preservation must

be specific and unequivocal."  *In re Futter Lumber Corp.*, 473 B.R. 20, 30 (E.D.N.Y. 2012).  The

Estate's reservation of rights is specific and unequivocal, but is expressly limited to claims

"against the Shaw Sisters or other shareholders, officers or directors of SFA."  Fourth Amended

Consolidated Chapter 11 Plan and Disclosure Statement at 63, Chapter 11 Docket No. 246.  It

does not cover claims asserted against Adelman.  Accordingly, Adelman's motion, construed as

a motion to dismiss the Second Amended Complaint must be granted and all claims against

Adelman must be dismissed.

## IV.    Rule 11 Motion

Shaw Family Defendants' Rule 11 Motion is denied.  Rule 11(b) provides:

> By presenting to the court a pleading, written motion, or other paper--whether by signing,
> filing, submitting, or later advocating it--an attorney or unrepresented party certifies that
> to the best of the person's knowledge, information, and belief, formed after an inquiry
> reasonable under the circumstances: (1) it is not being presented for any improper
> purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of
> litigation; (2) the claims, defenses, and other legal contentions are warranted by existing
> law or by a nonfrivolous argument for extending, modifying, or reversing existing law or
> for establishing new law; (3) the factual contentions have evidentiary support or, if
> specifically so identified, will likely have evidentiary support after a reasonable
> opportunity for further investigation or discovery; and (4) the denials of factual
> contentions are warranted on the evidence or, if specifically so identified, are reasonably
> based on belief or a lack of information.

Fed. R. Civ. P. 11(b).  For purposes of Rule 11, an argument constitutes a frivolous legal position

if, under an "objective standard of reasonableness," it is "clear . . . that there is no chance of

success and no reasonable argument to extend, modify or reverse the law as it stands."  *May Ship*

*Repair Contracting Corp. v. Barge Columbia New York*, 160 F. Supp. 2d 594, 600 (S.D.N.Y.

2001).  If the Court finds that an attorney has violated Rule 11(b), it "may impose an appropriate sanction."  *Id.* 11(c).  Sanctions are discretionary.

Shaw Family Defendants assert that the Estate's claims and arguments are so frivolous that sanctions are warranted.  This Opinion and Order makes clear that the Estate's claims and arguments are not so frivolous as to warrant sanctions; indeed, many of the Estate's claims have survived Shaw Family Defendants' Rule 12(b)(6) motion.

Shaw Family Defendants' Rule 11 Motion also claims that the Estate has made additional miscellaneous "misrepresentations" to the Court.  But Shaw Family Defendants either omit important context that temper the Estate's statements, or simply disagree with the Estate about the import of certain facts.  Although the Estate may have engaged in hyperbole or rhetoric, which is unwelcome, the Court declines to impose sanctions at this time.

## CONCLUSION[16]

For the foregoing reasons, Adelman's motion to dismiss is GRANTED in its entirety and all claims asserted in the Second Amended Complaint against Adelman are DISMISSED.  Shaw Family Defendants' motion to dismiss is GRANTED with respect to claims 9, 12, 15, 19, and 21 and that much of claim 8 that relies on the theory that the 1998 Trust is invalid; the motion is DENIED in all other respects.  Shaw Family Defendants' motion for Rule 11 sanctions is DENIED in its entirety.  The Court respectfully directs the Clerk to terminate Adelman as a Defendant in this action, to amend the caption to reflect his removal, and to terminate the motions at ECF Nos. 50, 71, and 75.

---

[16] The Court has considered the parties' remaining arguments and finds them unpersuasive.

Dated:    September 22 2015                    SO ORDERED:
          White Plains, New York

                                               _____
                                               NELSON S. ROMÁN
                                               United States District Judge